**A/S APOTHEKERNES LABORATORI-UM FOR SPECIALPRAEPARATER,**
Plaintiff,

v.

**I.M.C. CHEMICAL GROUP, INC., and Dr. M. B. Gillis, Defendant.**

**No. 78 C 2872.**

United States District Court, N.D. Illinois, E.D.

Jan. 26, 1988.

Robert E. Shapiro, Michael P. Foradas, Kirkland & Ellis, Chicago, Ill., for plaintiff.

John J. Arado, Joan M. Fencik, Wildman Harrold Allen & Dixon, Chicago, Ill., for defendant.

## MEMORANDUM AND ORDER

MORAN, District Judge.

This court granted summary judgment for defendants on certain counts, the Court of Appeals dismissed an interlocutory appeal, *A/S Apothekernes Laboratorium for Specialpraeparater v. I.M.C. Chemical Group, Inc. and Dr. M.B. Gillis*, 725 F.2d 1140 (7th Cir.1984), the matter proceeded to trial, this court made findings of fact upon

the record and requested further legal argument, the parties responded, and there the matter has long sat. This court now supplements the findings of fact and enters judgment for the defendants.

Because the facts have in large part been thrice described (in this court's first opinion, the Court of Appeals opinion, and in this court's oral findings after trial), they need not be fully repeated here. Summarized, plaintiff (Apothekernes), through its president, E.W. Sissener (Sissener), entered into extended negotiations with the corporate defendant (IMC), of which the individual defendant (Gillis) was president and chief executive officer, for the purchase of various IMC assets. During the course of those negotiations the scope of the contemplated acquisition considerably narrowed and by December, 1977, the parties were talking about the purchase of some, but not all, of the Terre Haute plant facilities and business, with certain portions of the facility remaining with IMC. On December 9, 1977, the parties entered into a letter of intent "to set forth the terms upon which we ... intend to negotiate and consummate an Agreement of Sale...." That letter, signed by Sissener and Gillis for their companies, evidenced the considerable negotiations which had already taken place, but it also indicated a number of substantial areas requiring further negotiation. Any agreement was "subject to our concluding an Agreement of Sale which shall be acceptable to the Boards of Directors of our respective corporations, whose discretion shall in no way be limited." The parties anticipated agreement within 60 days.

Sissener and IMC (the IMC negotiator was often a Dr. McMillan) continued their negotiations of what was a complex transaction of considerable importance to Apothekernes and of far lesser importance to IMC. The evidence amply established that the negotiations were protracted and, from IMC's perspective, somewhat tedious; that they did proceed in good faith; that they extended well beyond 60 days (without considering the necessity of drawing up a definitive Agreement of Sale); that on February 24, 1977, Sissener and Gillis were still apart on three matters which were "deal breakers"; and that there was by that date no agreement and no obligation by IMC to continue the negotiations. On that date, however, Sissener conceded, in fact capitulated in the face of a perceived ultimatum, on those three matters. The real issue, and only real issue, in this lawsuit is whether or not IMC became obligated when the two negotiators had a meeting of the minds on all substantial terms on February 24, 1977.

That issue here has been somewhat clouded by subsequent procedures. IMC is a wholly owned subsidiary. Gillis did not take his agreement to his board of directors for approval. Instead, he met with Richard Lenon, president of the parent corporation, and George Kennedy, an IMC board member and the parent corporation executive vice-president. Gillis had earlier that day advised Sissener he would talk to Lenon. The discussion was relatively brief, Gillis did not act as an advocate for the deal, Lenon rejected the contemplated sale, and Gillis thereafter induced the IMC board of directors to reject the sale.

Plaintiff has sought to rely to some extent upon the nature of that rejection—it was relatively informal and it was based, without much more, on Lenon's rejection. The IMC board acted as a rubber stamp for Lenon's decision. A parent corporation cannot refuse to recognize the binding effect of a legal obligation entered into by a subsidiary because the parent itself did not acquiesce. It is not, however, improper for the board of a subsidiary to rely uncritically upon the business judgment of the parent corporation as to what is in the best interests of the enterprise so long as that judgment is one which the board could have legally made if it had critically reviewed all the circumstances. *See Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769–74, 104 S.Ct. 2731, 2740–43, 81 L.Ed.2d 628 (1984). For our purposes, then, we consider that Lenon could reject the sale to the extent that the IMC board could reject the sale.

Could the IMC board reject the sale on February 27, 1977, or had the matter

then progressed beyond the point of reversal? We believe that the IMC was not fully committed in the circumstances, although the articulated legal standards perhaps oversimplify the applicable law.

Illinois law controls. "Under Illinois law the question of whether a binding contract exists is determined by the intent of the parties.... In measuring intent, all relevant circumstances surrounding negotiations and execution of [an interim] agreement should be considered.... Moreover, the contemplation of the execution of a formal agreement in the future does not render prior agreements mere negotiations where the parties intend that the formal agreement will be substantially based upon the earlier agreement." *Evans, Inc. v. Tiffany & Co.*, 416 F.Supp. 224, 238 (N.D.Ill. 1976). A determination of the "intent of the parties" is, however, dependent not upon their subjective beliefs but upon their objective manifestations of intention, *Skycom Corp. v. Telstar Corp.*, 813 F.2d 810, 814–15 (7th Cir.1987) (applying Wisconsin law); *Connecticut General Life Ins. Co. v. Chicago Title & Trust Co.*, 714 F.2d 48, 50 (7th Cir.1983) (applying Illinois law). In the twilight zone between preliminary agreement and final conclusion, courts have difficulty in ascribing a legal result on the basis of a presumed intent, as a contrast of *Computer Systems of America, Inc. v. International Business Machines Corp.*, 795 F.2d 1086 (1st Cir.1986) with *Reprosystem, B.V. v. SCM Corporation*, 727 F.2d 257 (2d Cir.), *cert. denied*, 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984), makes evident. There is, perhaps, sometimes a tendency to rely on the legal talisman of "condition precedent" or sometimes to throw hands in the air and leave it to a trier of fact to decide. It is an odd form of factual determination—in a mix of circumstances have the parties proceeded so far down the road that one of the parties cannot unilaterally decide to end the journey. "Intent" is a conclusion flowing from a complex of facts, *Robbins v. Lynch*, 836 F.2d 330, 332 (7th Cir.1988), and legal precedent is a far from perfect guide to how we should reach that conclusion.

Many of the cases, at least in Illinois, arise in the following circumstances: parties enter into negotiations and, after some negotiations, they execute a letter of intent or a memorandum of understanding. They intend, ultimately, to enter into a written agreement, but before such an agreement is signed one party decides not to go forward. The other party sues, claiming that there already is a binding contract. The legal issue is framed as to whether or not the parties intended to be bound before a written agreement was executed or whether a written agreement was a condition precedent to the formation of a contract. The resolution of that issue is a factual determination, depending upon all the relevant circumstances.

Parties have power to contract as they please. If a seller insists upon retaining the right to contract with anyone else, should his self interest be thereby served, until a specified event, *e.g.*, the execution of a formal agreement, the purchaser can hardly complain of a sale to another even though his transaction is on the brink of completion. *See Arnold Palmer Golf Co. v. Fuqua Industries, Inc.*, 541 F.2d 584, 587 & n. 2 (6th Cir.1976). Parties are seldom, however, so explicit in preserving their freedom of action, and courts are often called upon to determine what mutual obligations may have arisen from far more ambiguous circumstances. And that determination often depends upon implicit obligations of good faith, although the cases do not customarily distinguish between such obligations implied as a matter of fact or implied in law.

The relevant circumstances include, according to one Illinois case, whether the contract is one usually put into writing, whether there are few or many details, whether the amount involved is large or small, whether the agreement requires a formal writing for a full expression of covenants and promises, and whether negotiations themselves indicate that a written draft is contemplated as the final conclusion of negotiations. *Ceres Illinois, Inc. v. Illinois Scrap Processing, Inc.*, 130 Ill. App.3d 798, 803, 474 N.E.2d 1245, 1248, 86 Ill.Dec. 48, 51 (1st Dist.1984), *aff'd*, 114

Ill.2d 133, 500 N.E.2d 1, 102 Ill.Dec. 379 (1986). Those circumstances relate primarily to the nature and complexity of the transaction. We believe that the Illinois cases also give significant consideration to where in the negotiating process that process is abandoned, the reasons it is abandoned, the extent of the assurances previously given by the party which now disclaims any contract, and the other party's reliance upon the anticipated completed transaction.

The most significant Illinois case is *Borg–Warner Corp. v. Anchor Coupling Co.*, 16 Ill.2d 234, 156 N.E.2d 513 (1958), where the Supreme Court reversed a dismissal. There the defendant accepted a number of specific terms in a proposal to purchase the assets of a corporation, subject to four conditions. Defendant repeatedly assured plaintiff that it was a firm proposal, in effect an option with only four very minor matters to resolve, and that it would work those out in good faith in a reasonable manner. In reliance upon those assurances, plaintiff spent considerable sums and, when defendant refused to go forward, only two employment issues—both of which were amenable to reasonable resolution—remained. Whether or not there was, in those circumstances, a binding contract was up to a trier of fact.

In *Evans, Inc. v. Tiffany & Co., supra,* Judge McLaren was the trier of fact. The parties had executed a detailed letter of intent, a release by defendant to the press announced an agreement, and both parties expended considerable sums in anticipation of performance. During the course of drafting the various documents for what was a complicated transaction, however, defendant began to reopen old issues and raise new ones, and it eventually terminated the negotiations. Judge McLaren found that there was a contract. While some matters required resolution, the letter of intent included all essential terms and reflected a positive intent to be bound, none of the remaining issues was a deal breaker, and all were susceptible to reasonable resolution by good faith negotiation. The parties did not explicitly agree to bargain in

good faith, but the court implied such an obligation from general contract law.

Plaintiff here relies upon a number of cases which follow the familiar concept that a party to a contract must perform in good faith. The concept of good faith may not be, however, as firmly imbedded in Illinois law respecting contract formation as *Evans, Inc.* suggests. The court in *S.N. Nielsen Co. v. National Heat & Power Co., Inc.*, 32 Ill.App.3d 941, 337 N.E.2d 387 (1st Dist.1975), not surprisingly, affirmed a finding that there was no contract in circumstances which indicated that the plaintiff knew or should have known an initial bid was in error, retained a power to reject and never got to the point where it negotiated terms beyond the bid price. In *Brunette v. Vulcan Materials Co.*, 119 Ill.App. 2d 390, 256 N.E.2d 44 (1st Dist.1970), however, dismissal was affirmed because of repeated references to the preparation of a formal contract even though the pleadings indicated that negotiations were well advanced in a relatively simple real estate transaction. The court made no reference to any obligation to negotiate in good faith. Picking up on *Brunette,* the court in *Barry v. James,* 74 Ill.App.3d 975, 394 N.E.2d 55, 31 Ill.Dec. 139 (3d Dist.1979), affirmed summary judgment for defendant in somewhat similar circumstances, and there changing market conditions made it desirable for defendant to disclaim any contract. Again, good faith obligations were not considered.

And it continues. In *Chicago Title & Trust Co. v. Ceco Corp.*, 92 Ill.App.3d 58, 415 N.E.2d 668, 47 Ill.Dec. 663 (1st Dist. 1980), the trial court entered judgment for the defendant at the end of plaintiff's case, despite repeated assurances that there was a contract by the defendant's chief executive officer, substantial reliance by the plaintiff, and the existence of an acceptable draft agreement which defendant had only to sign and return. Defendant was able to avoid any contract obligations and obtain the benefits of a later but better offer from another because plaintiff kept insisting upon execution of a written agreement by a specified date, an insistence does not appear to have been unreasonable in light

of the defendant's previous failures to carry out its promises. That same year, in *Interway, Inc. v. Alagna*, 85 Ill.App.3d 1094, 407 N.E.2d 615, 41 Ill.Dec. 117 (1st Dist.1980), a dismissal was affirmed, the court resting upon "subject to" execution of a formal contract language in a letter of intent, in view of some matters which were not fully resolved in the letter of intent. The court distinguished *Borg–Warner* and *Evans* on the ground that in both there had been detrimental reliance and that substantial action in reliance upon expressed intentions could indicate the existence of a contract. Finally, in *Ceres Illinois, Inc. v. Illinois Processing, Inc., supra*, the finding of a contract was reversed on appeal as against the manifest weight of the evidence. There a new owner decided not to go forward with a real estate licensing transaction, despite the putative lessee's reliance, on the ground that the parties clearly intended a formal written agreement as a condition precedent. In none of these cases was the concept of good faith discussed.

What should we make of all this? The Delaware Supreme Court at an earlier time, in *Itek Corporation v. Chicago Aerial Industries, Inc.*, 248 A.2d 625 (Del.Sup. 1968), relied upon *Borg–Warner* (and an explicit agreement in a letter of intent to make a reasonable effort to agree) to reverse a summary judgment for defendant on the ground that there was evidence that defendant had agreed to be bound and did not negotiate the minor remaining issues in good faith. Our Court of Appeals, applying Wisconsin law, has affirmed findings that a written contract was not a condition precedent when there were assurances, the transaction was simple, and the essential terms had been decided. *Lambert Corp. v. Evans*, 575 F.2d 132 (7th Cir.1978). It affirmed a contrary finding in *Ginsu Products, Inc. v. Dart Industries, Inc.*, 786 F.2d 260 (7th Cir.1986). Perhaps "intent" means there is no contract until the agreement is memorialized in writing. Perhaps it means there is a contract when all terms were agreed upon and the agreement had only to be reduced to writing. Perhaps it means there is a contract when the parties

have agreed on the primary terms and a court can figure out what agreements they would have or should have reached on other terms if they had continued to negotiate in good faith. And, perhaps, as the contrasting results in *Lambert Corp.* and *Ginsu Products, Inc.* suggest, it means whatever a trier of fact determines it means if that determination is not inconsistent with the imperfect legal standards which guide it.

To a considerable extent, however, all these cases are somewhat beside the point to the issue to be determined here. Gillis did reach agreement on all substantial terms. If we assume that an obligation existed to exercise good faith in the preparation of documents (and this court believes that the Illinois Supreme Court would recognize such an obligation in light of *Borg–Warner*, for the reasons stated in *Evans*, despite the subsequent lower court decisions), there is no reason why the agreement could not have been formally memorialized. Here, however, there was another obstacle to finding an intent to contract on February 24, the requirement that any agreement would be acceptable to the IMF board, "whose discretion shall in no way be limited." It is of interest that in *Arnold Palmer Golf Co. v. Fuqua Industries, Inc., supra*, a case relied upon by plaintiff, the court reversed a summary judgment for defendant where the trial court had relied upon "subject to" language but did not consider a board-approval condition. The Sixth Circuit did not consider the board approval either, suggesting that perhaps board approval was necessary only if the terms earlier agreed upon were modified in the final agreement. That suggestion does not accord with the facts here.

The board-approval condition militates against contract here. Gillis was the chief executive officer of IMF. He was not disabled by statute from entering into a binding agreement, *see Morgan v. South Bend Community School Corp.*, 797 F.2d 471, 478–79 (7th Cir.1986), and he had an obligation to bargain in good faith, *Chase v. Consolidated Foods Corp.*, 744 F.2d 566, 571 (7th Cir.1984). But he did so bargain

and he reached agreement. He had neither the authority nor the apparent authority, however, to bind IMC to a disposition of substantial corporate assets, *see id.* at 569, as was explicitly made clear in the letter of intent. If the IMC board had an obligation to accept the results of his negotiations should they be reasonably in accord with the letter of intent (which they were), that obligation would conflict with limitations upon Gillis' authority which were implied in law and explicit in the letter of intent. We conclude that such was not intended.

An acquisition of assets is a complicated transaction, particularly where, as here, the parties contemplated joint use of a production facility. In these circumstances, a letter of intent is generally a step to an end and not itself a contract. *Skycom Corporation v. Telstar Corporation, supra,* at 816. Apothekernes spent nothing, or virtually nothing, on the supposition it had a deal. It could not reasonably suppose it did have a deal until February 24, 1977. IMF did not terminate the process because it had been seduced by a competing offer. The need for board approval was explicit in the letter of intent, and while Gillis had perhaps indicated his confidence that board approval would be forthcoming, there was no certainty that it would be granted. *See Chase v. Consolidated Foods Corp., supra.*

Gillis did not believe there was a contract. He went to Lenon because he believed that the ultimate decision had to be made by Lenon, with the IMF, through its board, thereafter acquiescing in whatever decision Lenon made. He told Sissener that he was taking it up with Lenon. We do not have here a scenario in which Gillis asked Lenon or the IMF board to bail him out of an agreement he then regretted but which they otherwise would have approved. Nor do we have a scenario in which the IMF board approved the agreement negotiated by Gillis and so advised plaintiff, only to reverse its position shortly before the last closing document was drafted and executed. Before there was a contract the IMF board had to approve what its negotiator had approved, and the IMF board would not approve unless Lenon approved, and Lenon said no. There was no contract.

This court is and has been uncomfortable with its decision, and that has been a primary cause in the delay since the last legal memorandum. That discomfort has arisen not because the decision was in doubt but because it was not. Plaintiff is a relatively small company and the acquisition was important to it. The sale was, to the corporate defendant and particularly to its parent, of far less significance. The amount involved was, to them, rather pedestrian and, even though a matter necessarily requiring IMF board approval, rather routine. It was treated as such by Lenon, who concluded, after a summary briefing, that the transaction was too much trouble. Plaintiff's tenacity in negotiation, because of the importance of the transaction to Apothekernes, became the irritant which led Lenon to deny, summarily, its fruition. That denial does not reflect well upon Lenon, IMF or its parent. But this court cannot find that it violated any binding agreement between contractual parties.